By the Court, Robertson, Ch. J.
There cannot be a doubt, on reading the answer in this case, that it presents different defenses to the whole, or different parts of the cause of action alleged in the complaint. After setting forth the evidence of the publication complained of, which had been suppressed in the complaint, the defendants aver therein the preferment of the charges, and allege the trial and consequent dismissal of •the plaintiff, and claim that the account of such charges, trial and dismissal in such publication was a just, fair and impartial statement of them, and was privileged; this was evidently aimed only at the body of the publication. They next, for a further defense in such answer to the part of the publication stated in the complaint, set forth the official character of the plaintiff) his receipt of a salary for his services in such capacity, and also his acceptance, for his own benefit, of a certain sum without the consent of the police commissioners, for his services as such policeman in the cases before mentioned ; and aver that such acceptance of such money “ was and is known, denominated and called throughout this community as blackmail, and ® * blackmailing, and it is so known and under *289 stood by the community generally.” They also set up, in such second defense, the charges, trial and dismissal before mentioned, and claim the benefit of the privileged character of the publication.
Neither of such defenses, so set up, may prove to be a legal defense in this action, or shew that the heading and first part of such defamatory article set out in the complaint, was a privileged communication, or any part of one ; but the second one does set up a justification as to the comments on the plaintiff’s trial, contained in such article, and undoubtedly should have been sustained on the trial, if receiving money under the circumstances specified was “ blackmailing,” under the general or legal meaning of the word, or, under its local meaning, if parol evidence be admissible to establish such meaning. The testimony of the author of the article was evidence of such local meaning, if material to the defense of the defendants. The learned judge, therefore, in his instructions to the jury, on the trial, that there was no “ justification either set up or proven on the trial,” for the publication, must be understood as meaning no legal justification ; in other words, that neither any nor all of the matters set up in the answer constituted a defense. The exception to such instruction, as well as to the refusal to charge that the legal meaning of the word “ blackmailing” was equivocal, and therefore its construction as libellous, was a question for the jury, or that if, under the evidence, they thought it equivocal, it was also a question for them, fully raises the question whether parol evidence is admissible in an action of libel, to shew a local meaning of the language used, which embraces the occurrences or conduct charged, both when the legal meaning of such language is equivocal and when it is unequivocal.
I assume that under this the decision formerly rendered in this case, (17 Abb. Pr. 226,) it is the settled law of this court, that any comments which accompany a correct report of a judicial proceeding in regard to the conduct of any one, which they do not warrant as a legitimate conclusion, if defamatory, are libelous, notwithstanding the leading case in this state, relied on in *290 the opinion then delivered, Thomas v. Crowell, (7 John. 264,) merely denies the right to “garble” or “discolor” accounts of judicial proceedings, so as “ to asperse character,” by “ comments or constructions,” without responsibility ; and although in cases of slander, accompanying words may be had recourse to, or even extrinsic circumstances, to show that they were used “ mitiori sensu.” (Van Rensselaer v. Dole, 1 John. Cas. 279. Dexter v. Taber, 12 John. 239. Quini v. O’Gara, 2 E. D. Smith, 388.) For the two other cases cited in such opinion, (Stanley v. Webb, 4 Sandf. 21, and Clement v. Lewis, 3 Brod. & Bing. 279,) are decisive on that question ; the decision in the first, being in this court, was based on that of the second; in the former the heading was, “ extorting money to hush up a complaint,” and in the second, “shameful conduct of an attorney.” Another case may also be added, (Barthelemy v. The People, 2 Hill, 248,) which also sustains such view, in which facts occurring in the proceedings referred to, and not charged in the publication, were not allowed to be proved to support its accusations. The ground of such distinction between words written and spoken defamatory words, is not very clear, perhaps, but any removal of the distinction itself, can only be made by an appellate court.
The next question that presents itself is whether this court, in its decision at general term in this case, definitively held, as a conclusion of law, that the term “ blackmailing” could mean nothing but the imputation of a crime or offense, of which the plaintiff was not guilty, under the circumstances stated in the pleadings, and not merely that, as a conclusion of law, such circumstances would not warrant such a charge. The latter would evidently have been a sufficient ground to warrant the judgment of the court of reversal in such case,, as the question had been entirely withdrawn from the jury at the first trial. In order to ascertain, therefore, if the first was the ground, it will be necessary to look a little into the learned and elaborate opinion delivered at general term, already referred to.
With the respect I entertain for my learned brother who *291 delivered that opinion, and before whom that cause was last tiled, I cannot bring myself to believe that after a thorough examination of the meaning of the word “ blackmail,” lexi-. cographically, etymologically, and in its common use, he meant to hold that there was no sense of it which could be applied to a public officer for receiving money without the consent of his superior, for 'services rendered in the discharge of his duty, for which he received a salary, when prohibited by law from receiving it without such consent. The learned judge, after citing a definition of “ blackmailfrom Wharton’s Law Lexicon, as being money paid to be protected from devastation, states in such opinion, that “ substantially, we now attach the same meaning to the term.” He then adds: “ In common' parlance, and in general acceptation, it is equivalent to, and synonymous with, extortion which he apparently defines as “ the exaction of money, either for the performance of a duty, the prevention of an injury, or the exercise of an influence.” This, clearly, would bring the reception of money by a public officer, for the discharge of his duty, from the parties benefited, within such latter definition. But he adds : “ It supposes the service to be unlawful, and the payment involuntary ;” and then proceeds to point out various modes of moral compulsion, which he considers may render it involuntary. He concedes, ■ however, that ufrom its indefiniteness and, comprehensiveness, the offense is not classified as a distinct crime,” although “ believed to be criminal.” Under such a course of reasoning and statement, assuming such definitions to be accurate, when the only point to be arrived at was, whether the learned judge, before whom the cause was originally tried, was right in withdrawing the case entirely from the jury, if it appears, oh more full examination, that the offense of which the plaintiff was guilty, was akin to that of extortion, as an offense known to the law, and that the settled meaning of blackmail is not confined to the payment of tribute for protection against injury, or if it were so, that it is exactly what the plaintiff did, unless there be an essential distinction between redress and prevention, I trust I shall be pardoned *292 in making the inference that the general term of this court did not intend to establish, as an absolute rule of law, that the term 'blackmailing was of so certain, definite and narrow a meaning, that it could not be applied to the plaintiff’s conduct in question, to characterize it.
Extortion is made by Blackstone ([Com. vol. 2, p. 141,) a public offense; and he defines it to be “ an abuse of public justice which consists in any officer’s unlawfully taking, by color of Ms office, any money that is not due to him.” Hawkins adds to this, “ more than is due, or before it becomes due.” (1 Pl. of Cr. B. 68, § 1.) And the Revised Statutes (vol. 2, p. 651, § 7) declare that “ no * * person to whom any * compensation shall be allowed by law for any service, shall take * any other * reward for such service but such as is or shall be allowed by the laws of this stateand that a violation of such provision shall be a misdemeanor. (Id. § 17.) And although proceedings under the fourth part of such statutes are excepted from the operation of such provisions, inducing swindlers to refund money through threats ■ or fear of official action against them, is not included as part of such proceedings.
Officers appointed by the Board of Metropolitan Police hold during good behaviour. (Laws of 1860, ch. 259, § 13.) The commissioners of such board are empowered to enact “ rules and regulations of general discipline.” (Id. § 27.) No policeman can be removed except on charges preferred against him according to such rules and regulations, and upon a public hearing and examination of such charges, after notice to him. (§ 13.) Such board has power to issue subpoenas tested in the name of its president, and to administer oaths to parties summoned thereby, whose false swearing therein is declared to be perjury. (Id. § 25.) It is declared to be cause of removal for any member of the police force to receive any reward or present for services rendered in the discharge of his duty, without notice to such board, (Id. § 65,) and such rewards become the property of certain trustees. (Id. § 66.) Clearly, such board act judicially to hear and determine charges against *293 officers of the force for offenses against its regulations, or the laws of this state which relate to their office ; and removal from office for violations of them, follows as a punishment. Upon such a trial and conviction the plaintiff was removed. The essential of illegality which the learned judge, in his opinion already alluded to, considered to be necessary to make up the offense of extortion, in blackmailing, was not wanting ; unless what is prohibited and punished by law be not illegal. It strikes me, therefore, that the illegal acceptance of money by a police officer from a party injured, for services in the line of his duty, for which he already receives a salary, comes so near extortion, both in its legal and ordinary sense, at least- so far as that idea enters into the meaning of blackmailing, as to exempt the defendants from suffering a severe lesson for the ignorance of legal philology.
The foregoing views, however, presuppose blackmailing, as ordinarily understood, necessarily to include the idea of extortion by moral compulsion. No authority is given for such exclusive interpretation, or when, how or where such limitations of its original meaning began. If we are allowed to abandon reliance upon lexicographers of established reputation, and trust to a general understanding, very few will agree upon the same sense. Worcester states, in his dictionary, that blackmail originally meant the performance of labor, payment of copper coin, or delivery of certain things in kind, as rent, and refers to it as a term in old English law. It was contrasted with blanch-farm or white rent, which was paid in silver. (Burrill’s Law Diet, in Derb.) Spelinan, in his glossary, attributes the term black to the color of the coin ; Jamieson, in his dictionary, to its illegality. The term mail does not seem to be derived from any French word “ maille,” if there be such an one, but rather from the Gaelic “mal” a rent, or the German “ mahl,” a tribute ; the difference in sense being: trifling:. The sense in which it was used, mentioned by Wharton, is secondary, and confined originally to the north of England. ([Whishaiv’s Law Diet.) Uean Swift used it to signify “hush money,” or “money extorted from persons under the *294 threat of exposure in print for an alleged offense.” Bartlett, in his Dictionary of Americanisms, is the first lexicographer who confines its meaning to that sense, and the use of it in such sense to this country, This brief allusion to its origin and variety of meanings at different times, and in different countries, and by different authors, shows the danger of confiding in any supposed general employment of it in any limited sense. I am not satisfied, therefore, that the meaning of blackmailing is legally confined to extortion by threats or other morally compulsory measures; the influence arising out of previous dependency and superfluous gratitude to a public officer for merely doing his duty arising out of the recovery of property expected to be lost, accompanied by the power of playing upon the hopes and fears of the party injured, may be as effective as any moral compulsion. The law sets aside executory contracts obtained under similar influences.
The general rule as to the interpretation of words, is that words spoken are to be construed in the sense in which they are understood by those who hear them, (Backus v. Richardson, 5 John. 476;) and if susceptible of two interpretations, the intended sense is a matter for the jury, (Woolcott v. Goodrich, 5 Cowen, 714.) The meaning, of words not unavoidably imputing something derogatory to the person of whom they are published, must be submitted to a jury. (Lewis v. Chapman, 16 N. Y. Rep. 369.) The question of privilege in the use of even libelous words as legitimate criticism, is to be set up by answer, and submitted to a jury, (Cooper v. Stone, 24 Wend. 434;) the court can only pronounce them prima facie libelous.
The case of Stone v. Cooper, (2 Denio, 293,) fully illustrates the danger if not impropriety of assuming the “ durior sensus ” of a word to have been universally adopted. The charge in that case was against'the plaintiff, that he was in haste to collect money due him, “to put it in Wall street for shaving purposes.” The court in that case held, construing the word shaving “ mitiori sensu,” that although frequently used to imply oppression or extortion, its natural meaning was simply *295 buying notes at a discount beyond interest.” In that case there was no allegation in the pleadings of the sense in which the word was intended to be used, and it was, therefore, left to its prima facie legal construction. In this case there was evidence on the tirial, as was alleged in the answer, that the generally understood meaning in the community in which the written article in controversy was published (New York,) of the acts with which the plaintiff was charged by it was blade-mailing. The two witnesses who were examined as to its meaning, differed widely as to it; the witness for the defendants leaves out wholly the idea of extortion or moral coercion, and restricts it to “money improperly received for services rendered, or to be rendered.” The other witness said “it was extorting money illegally, immorally, or wrongfully; ” possibly, he embraced the idea of extortion also.
Although greater liberality seems to be exercised in the case of words when they are spoken than when they are contained in written or printed articles, yet in both cases it must be one of intent; of course, a person must be presumed to have used words in their ordinary import among those who speak the language to which such words belong, in the community in which they are uttered or published ; but if they have acquired by local usage a different meaning, it must be presumed that they were used to convey the ideas attached to them by such usage, and such meaning may be alleged as a fact in the pleadings, and the evidence upon it may be passed upon by the jury. The meaning of all words in the English language is not everywhere the same, and the only criterion of the meaning of them as used on any occasion is the understood meaning in the community, society or individuals to whom they were addressed ; it is only when understood in that sense they do the party at whom they are aimed any injury.
I think, therefore, the sense in which the term blackmail was intended to be used by the defendants in the article in question ought to have been submitted to the jury; and for this reason the judgment should be reversed, and a new trial had, with costs to abide the event.